**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WESLEY FEEHRER and PETER MALVASI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EQUIFAX, INC.,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs, Wesley Feehrer and Peter Malvasi ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant, Equifax Inc. ("Equifax").

## I.     <u>NATURE OF THE ACTION</u>

1.      Plaintiffs bring this class action against Equifax for its failure to secure and safeguard the private information of Plaintiffs and approximately 143 million Americans.

2.      On July 29, 2017, Equifax discovered but failed to disclose unauthorized access to its databases storing the confidential and private consumer information of millions of U.S. consumers.

3.      On September 7, 2017, Equifax publicly announced that due to vulnerability in its systems, its files were accessed by criminals for at least the period of mid-May through July of 2017 the ("Security Breach").  According to Equifax, information accessed includes names, Social Security numbers, birth dates, addresses, and driver's license numbers, in

addition to credit card numbers for some consumers and other documents containing personal identity information ("the Private Information").

4.    Plaintiffs and Class members' Private Information was accessed and stolen by hackers in the Security Breach.

5.    Equifax's security failures enabled and facilitated the criminals' access, obtainment, theft, and misuse of Plaintiffs' and Class members' Private Information. Unauthorized persons gained access to Equifax's databases through vulnerabilities in its security and executed commands that caused the system to transmit to the unauthorized person's electronic data comprising millions of Americans' Private Information. Equifax's security failures also put Plaintiffs and Class members at serious, immediate, and ongoing risk of identity theft, and additionally, will cause costs and expenses to Plaintiffs and Class members attributable to responding, identifying, and correcting damages that were reasonably foreseeable as a result of Equifax's willful and negligent conduct.

6.    The Security Breach was caused and enabled by Equifax's knowing violation of its obligations to secure consumer information. Equifax failed to comply with security standards and allowed the Private Information of millions collected by Equifax to be compromised by cutting corners on security measures that could have prevented or mitigated the Security Breach. Defendant also violated applicable laws by failing to comply with state and federal notification laws as set forth herein.

7.    Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, assert claims for violation of the Fair Credit Reporting Act, and violations of the New Jersey Consumer Fraud Act. Plaintiffs seek monetary damages, punitive damages, statutory damages, and injunctive relief, and all other relief as authorized in equity and by law.

## II.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' Fair Credit Reporting Act claims arise under the laws of the United States.

9.    This Court also has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

10.    This Court has personal jurisdiction over Equifax because Plaintiffs' claims arise out of Equifax's contacts with New Jersey.

11.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims emanated from activities within this District.

## III.    PARTIES

12.    Plaintiff, Peter Malvasi ("Malvasi), resides in New Jersey, and is a citizen of the State of New Jersey. Malvasi has determined that his private information was affected by the Security Breach. As a result of the Security Breach, Malvasi is at heightened risk of identity theft suffered from the deprivation of the value of his Private Information and will incur future costs and expenditures of time to protect herself from identity theft. Malvasi has suffered additional injury, in fact, when his social security number was used to change the password on his social security website account. In addition, as a result of the breach, Plaintiff Malvasi bought Identity Guard credit protection for $24.95 per month.

13.    Plaintiff, Wesley Feehrer ("Feehrer"), resides in New Jersey, and is a citizen of the State of New Jersey. After learning of the Security Breach, Feehrer determined that his

private information was affected by the Security Breach. As a result of the Security Breach, Feehrer is at heightened risk of identity theft and suffered from the deprivation of the value of his Private Information and will incur future costs and expenditures of time to protect him from identity theft.

14.    Defendant Equifax is a nationwide consumer reporting agency and purveyor of credit monitoring and identity theft protection services. Equifax is a Georgia corporation headquartered in Atlanta, Georgia.

## IV.    FACTUAL BACKGROUND

15.    Equifax is in the business of collecting, assessing, and maintaining the Private Information of approximately 800 million consumers around the world in order to sell this information to third parties in the form of consumer credit reports, consumer insurance reports, or consumer demographic or analytics information. It also sells credit protection and identity theft monitoring services to consumers.

16.    In the years preceding Equifax's announcement of the Security Breach, several entities storing large quantities of consumer data caused massive security breaches, including health insurer Anthem, Yahoo, Equifax's competitor, Experian, and many others. Equifax knew or should have known that the Private Information contained in its databases was a prime target for hackers. In fact, it makes many millions of dollars in profits convincing Americans to buy its credit protection and identity theft monitoring services to guard against such breaches and the damages they cause. Despite this, Equifax failed to take adequate steps to secure its systems.

17.    Equifax refused to change or upgrade its Apache software.  The potential vulnerability of the Apache Strut software was no secret. Security researchers with Cisco

4

Systems Inc. warned in March 2017 that a flaw in the Apache Struts software was being exploited in a "high number" of cyber-attacks. Despite this warning, Equifax continued to use the software. Equifax was reportedly using an outdated version of Apache Struts at the time of the data breach.[1]

**Equifax Security Breach**

18.    From mid-May to late July of 2017, hackers exploited vulnerability in Equifax's U.S. web server software to illegally gain access to certain consumer files. Investigators believe that the point of entry may have been a software application called Apache Struts.[2]

19.    Over this nearly three-month period, the Equifax hackers accessed consumer names, social security numbers, birth dates, addresses, and driver's license numbers. The compromised data contains complete profiles of consumers whose personal information was collected and maintained by Equifax.

20.    Equifax estimates that 143 million Americans were impacted by this breach, although it admits that it is still in the process of "conducting a comprehensive forensic review" with a cybersecurity firm "to determine the scope of the intrusion."[3]

21.    In addition to accessing sensitive personal information, the hackers also accessed an estimated 209,000 consumer credit card numbers, and an estimated 182,000 dispute records containing additional personal information were compromised.[4]

---

[1]    *Id.*

[2]    Anna Maria Androtis *et al.*, *Equifax Hack Leaves Consumers, Financial Firms Scrambling*, WALL STREET JOURNAL, Sept. 8, 2017, *available at* https://www.wsj.com/articles/equifax-hack-leaves-consumers-financial-firms-scrambling-1504906993

[3]    Equifax, *Cybersecurity Incident & Important Consumer Information* (Sept. 8, 2017), https://www.equifaxsecurity2017.com/.

[4]    *Id.*

22.    Equifax reportedly discovered this breach on July 29, 2017.[5]

23.    After Equifax discovered this breach but before Equifax disclosed the breach to the public, three high-level executives sold shares in the company worth nearly $1.8 million.[6] On August 1, just three days after Equifax discovered the breach, Equifax Chief Financial Officer John Gamble sold $946,374 worth of stock, and President of U.S. Information Solutions Joseph Loughran exercised options to sell $584,099 worth of stock. The next day, President of Workforce Solutions, Rodolfo Ploder, sold $250,458 worth of stock.

24.    Equifax did not report this breach to the public until September 7, 2017. Equifax has not explained its delay in reporting this breach to the public.

25.    Since the breach was publicly revealed, federal regulators have said that they are examining Equifax's actions. The FBI is also investigating the breach, and two congressional committees announced that they would hold hearings.[7]

26.    Equifax victims who had their social security number and date of birth comprised may suffer additional hardships.  Under U.S. Social Security Administration (SSA) policy, individuals cannot obtain a new social security number until there is evidence of ongoing problems due to misuse of the Social Security number.  Even then, the SSA recognizes that "a new number probably will not solve all your problems.  This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number.  Along with

---

[5]    *Id.*

[6]    Anders Melin, *Three Equifax Managers Sold Stock Before Cyber Hack Revealed*, BLOOMBERG (Sept. 7, 2017), *available at* https://www.bloomberg.com/news/articles/2017-09-07/three-equifax- executives-sold-stock-before-revealing-cyber-hack.

[7]    Androtis, *supra.*

other personal information, credit reporting companies use the number to identify your credit

record.  So using a new number will not guarantee you a fresh start."

27.    In fact, a new social security number is substantially less effective where "other

personal information, such as [the victim's] name and address, remains the same" and for some

victims, "a new number actually creates new problems.  If the old credit information is not

associated with [the victim's] new number, the absence of any credit history under your new

number may make it more difficult for [the victim] to get credit."

**The Breach Was The Result Of Equifax's Failure**
**To Properly And Adequately Secure Its U.S. Website**

28.    The Equifax breach was the direct result of Equifax's failure to properly and

adequately secure its U.S. website.

29.    Specifically, Equifax failed to heed warnings from security experts about the

vulnerabilities in its Apache Strut software. Additionally, Equifax failed to update this software

to its latest version.

30.    Equifax admitted in public statements that hackers were able to access this data by

exploiting vulnerability in Equifax's U.S. website application to illegally gain access to

consumer files.

31.    Equifax should have recognized and identified the flaws in its data security and

should have taken measures to fix these vulnerabilities. Equifax had a duty to take advantage of

what experts had already learned about security vulnerabilities and to use industry best practices,

such as updating software to the latest version, to prevent a security breach.

32.    Even before this incident, Equifax was on notice of potential problems with its

web security. A security researcher has reported that in August, hackers claimed to have illegally

obtained credit-card information from Equifax, which they were attempting to sell in an online

database. *See* Thomas Fox-Brewster, *A Brief History of Equifax Security Fails*, Forbes, September 8, 2017.  Equifax had a duty to respond to a report of a significant software security flaw. Despite Equifax's knowledge of these potential security threats, and the foreseeability of a hack, Equifax willfully (or at least negligently) failed to enact appropriate measures to ensure the security of its consumer files, including failing to encrypt sensitive personal and financial consumer information.

33.    Equifax is well aware of the costs and risks associated with identity theft. On its website, Equifax lists "some of the ways identity theft might happen," including when identity thieves "steal electronic records through a data breach."

**Security Breaches Lead To Identity Theft And Put Plaintiffs And Class Members At Risk**

34.    According the U.S. Department of Justice Bureau of Justice Statistics, an estimated 17.6 million people were victims of one or more incidents of identity theft in 2014.[8]

35.    The Federal Trade Commission ("FTC") cautions that identity theft wreaks havoc on consumers' finances, credit history and reputation and can take time, money, and patience to resolve.[9]  Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[10]

---

[8]    See *Victims of Identity Theft, 2014,* DOJ, at 1 (2015), available at https://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Sept. 8,2017).

[9]    *See Taking Charge, What to Do If Your Identity is Stolen,* FTC, at 3 *(2012),* available at http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited Sept. 8, 2017).

[10]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § *603.2.* The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

36.     In fact, "[a] quarter of consumers that received data breach letters [in 2012] wound up becoming a victim of identity fraud."[11]

**The Monetary Value of Privacy Protections and Private Information**

37.     Plaintiffs have a valuable property interest in their own name and other unique personal identifiers, including their Private Information. As long ago as *Brown Chemical Company v. Meyer*, 138 U.S. 540 (1891), the United States Supreme court recognized that a person's "name" is their own property and they have the same right to its use and enjoyment as they do in other species of their property. Accordingly, when Plaintiffs' and class members home and unique personal identifiers were "hacked" they have suffered injury to a recognized property interest when hackers gained possession of Plaintiffs' name and without permission or authorization.

38.     Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black- market" for a number of years.[12] As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen private information directly on various Internet websites, making the information publicly available.

39.     The FTC has recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

---

[11]     *One in Four that Receive Data Breach Letters Affected By Identity Theft,* available at http://blog.kaspersky.comldata-breach-Ietters-affected-by-identity-theft! (last visited Sept. 8, 2017).

[12]     Companies, in fact, also recognize Private Information as an extremely valuable commodity akin to a form of personal property. *See* John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PERSONAL INFORMATION") Equals the "Value" of Financial Assets,* 15 RICH. J.L. & TECH. 11, at *3-4 (2009).

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis-and profit."[13]

40.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information. The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information.[14] This business has created a new market for the sale and purchase of this valuable data.[15]

41.     Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have already begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349."[16]

42.     The value of Plaintiffs' and Class members' Private Information on the black market is substantial. By way of the Security Breach, Equifax has deprived Plaintiffs and Class members of the substantial value of their Private Information.

---

[13]     *Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable,* (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Sept. 8, 2017).

[14]     Steve Lohr, *You WantMy Personal Data? Reward Me for It,* The New York Times, http://www.nytimes.com/2010/07118lbusinessI18unboxed.html(last visited Sept. 8, 2017).

[15]     *See Web's Hot New Commodity: Privacy,* http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Sept. 8, 2017).

[16]     See Department of Justice, *Victims of Identity Theft, 2014,* at 6 (2015), https://www.bjs.gov/contentlpub/pdf/vit14.pdf (last visited Sept. 8, 2017).

**Damages Sustained by Plaintiffs and Class Members**

43.    Plaintiffs and Class members have suffered injury and damages, including, but not limited to: (i) misappropriation of their Private Information personal property; (ii) an increased risk of identity theft and identity fraud; (ii) improper disclosure of their Private Information, which is now in the hands of criminals; (iii) the value of their time spent mitigating the increased risk of identity theft and identity fraud; and (iv) the value of their Private Information, for which there is a well-established national and international market-for which they are entitled to compensation.

44.    Acknowledging the damage to Plaintiffs and Class members, Equifax is instructing consumers to "be vigilant in reviewing their account statements and credit reports," "immediately report any unauthorized activity to their financial institutions" and to "monitor their personal information." Plaintiff and Class members now face a greater risk of identity theft.

## V.    CLASS **ACTION ALLEGATIONS**

45.    Plaintiffs bring all counts, as set forth below, on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as:

> All U.S. residents who's Private Information was affected by the Security Breach that occurred from at least mid-May 2017 through July 2017, including all persons who Equifax's "Check Potential Impact" tool identifies as being affected.

And a subclass defined as:  All New Jersey residents whose . . . .  Excluded from the Class and subclass are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

46.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

47.     **Numerosity-Federal Rule of Civil Procedure 23(a)(I).** The members of the Class and subclass are so numerous that joinder of all Class members would be impracticable. On information and belief, Class members number over one hundred million. The precise number of Class members and their subclass members' addresses are presently unknown to Plaintiffs, but may be ascertained from Equifax's books and records. Class and subclass members may be notified of the pendency of this action by mail, email, Internet postings, or publication.

48.     **Commonality and Predominance-Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and subclass members predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia:*

a.     Whether Equifax failed to use reasonable care and commercially reasonable methods to secure and safeguard Plaintiffs' and Class members' Private Information;

b.     Whether Equifax properly implemented its purported security measures to protect Plaintiffs' and Class members' Private Information from unauthorized capture, dissemination, and misuse;

c.     Whether Equifax took reasonable measures to determine the extent of the Security Breach after it first learned of same;

d.     Whether Equifax willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiffs' and Class members' Private Information;

e.     Whether Equifax was negligent in failing to properly secure and protect Plaintiffs' and Class members' Private Information;

      f.      Whether Equifax actions or omissions constituted violations of FCRA and/or NJCFA;

      g.     Whether Plaintiffs and Class members are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

49.    Equifax engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and Class members. Similar or identical common law and statutory violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

50.    **Typicality-Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of Class members and subclass members because, among other things, all Class members and subclass members were comparably injured through Equifax's uniform misconduct described above and were thus all subject to the Security Breach alleged herein. Further, there are no defenses available to Equifax that are unique to Plaintiffs.

51.    **Adequacy of Representation-Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of Class members he seeks to represent, they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Class' members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

52.    **Superiority-Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class

members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Equifax, so it would be impracticable for Class members to individually seek redress for Equifax's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS

### COUNT I
### Willful Failure To Comply With The Fair Credit Reporting Act, 15 U.S.C. § 1681n

53.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

54.    Equifax is a consumer reporting agency and is subject to the requirements of the federal Fair Credit Reporting Act.

55.    Plaintiffs' and Class members' Private Information are consumer reports under FCRA, because the information bears on, among other things, their credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, physical/medical conditions, and mode of living, and is used or collected, in whole or in part, for the purpose of establishing Plaintiffs' and Class members' eligibility for credit or insurance to be used primarily for personal, family, or household purposes.

56.    FCRA enumerates the exclusive purposes for which a consumer reporting agency can furnish consumer reports. 15 U.S.C. § 1681b. FCRA also requires that:

> Every consumer reporting agency shall maintain reasonable
> procedures designed to . . . limit the furnishing of consumer
> reports to the purposes listed under section 1681b of this title.
> These procedures shall require that prospective users of the

> information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose.

15 U.S.C. § 1681e.

57.    Defendant willfully, knowingly, or with reckless disregard, failed to adopt and maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under 15 U.S.C. § 1681b when it enabled and facilitated the Security Breach. Defendant failed to adequately vet users of its consumer reports, failed to inquire into suspicious circumstances despite possessing knowledge that put it on inquiry notice, and failed to reasonably monitor its customers' acquisition and use of consumer reports.

58.    Defendant willfully, knowingly, or with reckless disregard, failed to comply with the FCRA's requirements with respect to Plaintiffs and Class members. As a result of Defendant's failures, Defendant transmitted Plaintiffs' and Class members' Private Information to criminals for illegitimate and unauthorized purposes.

59.    As a further direct and foreseeable result of Defendant's willful noncompliance with FCRA, Plaintiffs' and Class members' Private Information will remain posted online in the public domain, compromised, and in possession of unauthorized third parties with fraudulent intent.

60.    Plaintiffs and Class members seek any actual damages they have sustained, or in the alternative not less than $100 and not more than $1,000 in statutory damages; punitive or treble damages as the court may allow, the costs of this action together with reasonable attorney's fees as determined by the court.

## COUNT II
## Negligent Failure To Comply With Fair Credit Reporting Act, 15 U.S.C. § 16810

61.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

62.     Defendant negligently failed to adopt and maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under 15 U.S.C. § 1681b when it enabled and facilitated the Security Breach. Defendant failed to adequately vet users of its consumer reports, failed to inquire into suspicious circumstances despite possessing knowledge that put it on inquiry notice, and failed to reasonably monitor its customers' acquisition and use of consumer reports.

63.     Plaintiffs' and Class members' Private Information was wrongfully furnished to criminals as a direct and foreseeable result of Defendant's negligent failure to adopt and maintain such reasonable procedures.

64.     As a direct and foreseeable result, Plaintiffs' and Class members' consumer reports were accessed, made accessible to, stolen, furnished, and sold to unauthorized third parties for illegitimate and unauthorized purposes.

65.     As a result of Defendant's negligent violations of FCRA, as described above, Plaintiffs and Class members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described in detail above.

66.     Plaintiff and Class members, therefore, are entitled to compensation for their actual damages, as well as attorneys' fees, litigation expenses, and costs, pursuant to 15 U.S.C. § 16810(a).

## COUNT III
### Unlawful Practices In Violation Of The
### New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-21 et seq.

67.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

68.     Plaintiffs and members of the subclass were subjected to Defendant's unfair or deceptive acts or practices, in violation of the New Jersey Consumer Fraud Act ("NJCFA")

N.J.S.A. § 56:8-2, et seq., in failing to properly implement adequate, commercially

reasonable security measures to protect their Private Information.

69.    Under the NJCFA, the following qualifies as an unlawful practice:

> The act, use or employment by any person of any
> unconscionable commercial practice, deception, fraud, false
> pretense, false promise, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact with
> intent that others rely upon such concealment, suppression or
> omission, in connection with the sale or advertisement of any
> merchandise or real estate, or with the subsequent performance
> of such person as aforesaid, whether or not any person has in
> fact been misled, deceived or damaged thereby.

N.J.S.A. § 56:8-2.

70.    In enacting the Identity Theft Prevention Act, which among other things,

amended the NJCFA, the New Jersey Legislature found that "[i]dentity theft is an act that

violates the privacy of our citizens and ruins their good names: victims can suffer restricted

access to credit and diminished employment opportunities, and may spend years repairing

damage to credit histories." N.J.S.A. § 56:11-45.

71.    Defendant willfully ignored the clear and present risk of a security breach of its

systems and failed to implement and maintain reasonable security measure to prevent, detect,

and mitigate the Security Breach.

72.    Defendant benefitted from not taking preventative measures and implementing

adequate security measures that would have prevented, detected, and mitigated the Security

Breach.

73.    Defendant's failure to implement and maintain reasonable security measures

caused and continues to cause substantial injury to Plaintiffs and the subclass members that is

not offset by countervailing benefits to consumers or competition or reasonable avoidable by consumers.

74.    Defendant's conduct offends public policy and is immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers.

75.    Plaintiffs and Class members have suffered actual ascertainable losses including improper disclosure of their Private Information, lost value of their Private Information, lost time and money incurred to mitigate and remediate the effects of the Security Breach, including the increased risk of identity theft that resulted and continues to face them.

76.    Plaintiffs and the Class members' injuries and losses were proximately caused by Defendant's violations of the NJCFA, which was conducted with reckless indifference toward the rights of others, such that an award of treble damages is warranted.

77.    Defendant's actions constitute a knowing, concealment, suppression, or omission in violation of N.J.S.A. § 56:8-2.

78.    As a result of the foregoing, Plaintiffs and subclass Members suffered and will continue to suffer ascertainable losses and other damages as described in detail in the preceding paragraphs of this Complaint, and are entitled to treble damages as provided by N.J.S.A. § 56:18- 19.

**COUNT IV**
**Failure To Expediently Notify Following Security Breach**
**In Violation Of The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 et seq.**

79.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth herein.

80.    As stated above, the NJCFA provides that it is "an unlawful practice and a violation of P.L. 1960 c. 39 (C.56:8-1 *et seq.* to willfully, knowingly or recklessly violate" Sections 56:8-161-164 of that Act.

81.    Section 56:8-163 of the NJCFA requires that a business conducting business in New Jersey:

> Shall disclose any breach of security of those computerized records following discovery or notification of the breach to any customer who is a resident of New Jersey whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person. The disclosure to a customer shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection c. of this section, or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

N.J.S.A. § 56:8-163.

82.    The NJCFA defines a breach of security as follows:

> "Breach of security" means unauthorized access to electronic files, media or data containing personal information that compromises the security, confidentiality or integrity of personal information when access to the personal information has not been secured by encryption or by any other method or technology that renders the acquisition of personal information by an employee or agent of the business for a legitimate business purpose is not a breach of security, provided that the personal information is not used for a purpose unrelated to the business or subject to further unauthorized disclosure.

N.J.S.A. § 56:8-161.

83.    Defendant's disclosure on September 7, 2017 regarding the breach of security to Plaintiffs and Class Members after learning of the breach as early as July 2017 was delayed and not made in the most expedient time possible.

84.     As a result of the foregoing, Plaintiffs and subclass Members suffered and will continue to suffer ascertainable losses and other damages and are entitled to treble damages as provided by N.J.S.A. § 56:18-19.

## COUNT V
## Negligence

85.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

86.     Equifax owed numerous duties to Plaintiffs and the other members of the Class. These duties include the duty:

    a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.    to protect Private Information in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

    c.    to implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class members of the Security Breach.

87.     Equifax knew or should have known the risks of collecting and storing Private Information and the importance of maintaining secure systems. Equifax knew of the many breaches that targeted other entities in the years preceding the Security Breach.

88.     Equifax knew or should have known that its systems did not adequately safeguard Plaintiffs and the Class members' Private Information.

89.     Equifax breached the duties it owed to Plaintiffs and Class members in several ways, including:

    d.    by failing to implement adequate security systems, protocols and practices sufficient to protect customer Private Information and thereby creating a foreseeable risk of harm;

20

e.  by failing to comply with the minimum industry data security standards; and

f.  by failing to timely and accurately discovery and disclose to customers that their Private Information had been improperly acquired or accessed.

90.  But for Equifax's wrongful and negligent breach of the duties it owed to Plaintiffs and Class members, their Private Information would not have been compromised. The injury and harm that Plaintiffs and Class members suffered was the direct and proximate result of Equifax's negligent conduct.

## VII.  DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against Equifax, as follows:

A.  Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Class Counsel;

B.  Ordering Equifax to pay actual damages to Plaintiffs and Class members;

C.  Entering an injunction against Equifax, prohibiting the deceptive conduct described herein;

D.  Ordering Equifax to pay statutory damages to Plaintiffs and the other members of the Class;

E.  Ordering Equifax to pay punitive damages, as allowable by law, to Plaintiffs and members of the Class;

F.  Ordering Equifax to pay attorneys' fees and litigation costs to Plaintiffs;

G.      Ordering Equifax to pay both pre- and post-judgment interest on any

amounts awarded as allowable by law; and

H.      Ordering such other and further relief as may be just and proper.

Dated: October 2, 2017

SQUITIERI & FEARON, LLP

By: /s/ Lee Squitieri
         Lee Squitieri
32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553
lee@sfclasslaw.com

JOSEPH R. SANTOLI, ESQ.
340 Devon Court
Ridgewood, New Jersey 07450
Tel: (201) 926-9200
Fax: (201) 644-0981
josephsantoli@aol.com

Attorneys for Plaintiffs